**INDUSTRIAL BUILDING MATERIALS, INC., Appellant,**

v.

**INTERCHEMICAL CORPORATION, Appellee.**

No. 22847.

United States Court of Appeals, Ninth Circuit.

Nov. 23, 1970.

As Amended on Denial of Rehearing Feb. 26, 1971.

Lyle L. Jones, San Diego, Cal. (argued), John A. Mitchell, San Diego, Cal., for appellant.

G. Richard Doty, Los Angeles, Cal. (argued), H. Peter Stoterau, of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for appellee.

Before BROWNING, ELY, and WRIGHT, Circuit Judges.

ELY, Circuit Judge:

The appellant, Industrial, filed an action for damages under the Sherman Act (15 U.S.C. §§ 1 & 2) and the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C. § 13(a)). After extensive discovery and pre-trial efforts at defining issues, the District Court dismissed the action for failure of plaintiff's counsel to comply with a court order and also granted summary judgment for defendants. Industrial appeals from both the summary judgment and the judgment of dismissal.

Defendants below were Martin-Marietta Company and Interchemical Corporation, now Inmont Corporation, successive owners of Martin-Marietta's Presstite Division. The dispute involves Presstite's decision that it would no longer avail itself of Industrial's services as a distributor. In 1961 Industrial purchased the business of Hubbard Company, who had almost exclusive rights to distribute Presstite products in California, Nevada, and Arizona. Industrial claims that, at the time of the purchase, Presstite's officers gave oral assurance that the exclusive distributorship arrangement would continue so long as Industrial "did a good job." Presstite was then owned by Martin-Marietta, but it was purchased by Interchemical in 1963.

Presstite produces sealing products, primarily for use in manufacturing various end products, such as trailers and airplanes. Presstite has far more shapes, sizes, and styles of sealants than any other manufacturer, and the combined products of thirty to forty of its competitors would be required substantially to duplicate its product line. This broad product line, argues Industrial, places Presstite in a somewhat unique position in the industry, inasmuch as customers ordinarily prefer to deal with one supplier who is able to fulfill all their needs rather than several different suppliers. Industrial alleges that Presstite holds monopoly power in the field of sealants, but the District Court held that its affidavits would not support an ultimate conclusion to that effect.

As of about the same time that Industrial purchased the Hubbard distributorship, Presstite was encountering difficulties in its western plant in El Segundo, California. Part of the solution later adopted by Presstite to counter these difficulties was the by-passing of Industrial and the distribution of its own products directly to Industrial's customers. Presstite contacted several of these customers, offering some of them discounts that resulted in the customers buying for lower prices than Industrial was given on its Presstite purchases. Presstite lured other customers away from Industrial by selling to them at the same price as Industrial was required to pay. One competitor of Industrial, distributing to certain elements of Industrial's trade, was given lower prices by Presstite than it gave to Industrial. Finally, Presstite hired Industrial's "top salesman," one Kite, who

took with him most of Industrial's remaining important customers. This pattern plus a recommendation from Presstite's sales manager that Presstite sell directly to Industrial's customers, was the basis for the allegations of violations of sections 1 & 2 of the Sherman Act and of section 2 of the Clayton Act, as amended by the Robinson-Patman Act.

Industrial's action was dismissed by the District Court under Rule 41(b), Fed.R.Civ.P. The dismissal culminated a long and confusing pre-trial process which failed clearly to define issues and specify Industrial's factual support to the court's satisfaction. After Industrial filed its complaint, defendants served a set of interrogatories that were not specifically answered in large part, because of lack of information. The court ordered that the interrogatories be answered specifically, but Industrial continued to claim a lack of sufficient information. After extensive discovery, Industrial filed a "Statement of Contentions" in an effort to define issues for trial. Interchemical then served another set of interrogatories. After several extensions of time, Industrial filed, instead of a seriatim response to each interrogatory, a two-volume "Narrative" and a ten-volume "Appendix" in which it purported to set out "the full mosaic of the case." Since this response did not conform literally to the Rules, Interchemical moved for specific answers. The then judge, to whom the case had been transferred, took the view that Industrial's response would be as satisfactory as specific answers for the purpose of delineating issues for trial. The judge suggested that Interchemical make a motion for summary judgment, but Industrial suggested that Interchemical should file a motion to eliminate issues, specifying all the issues and requesting Industrial either to admit that there was no case for certain issues or to set out all its evidence in support of those issues. This proposal was agreed to by all parties, and Interchemical filed a motion listing thirty possible issues.

Industrial responded to this motion by admitting that five of the thirty issues could be eliminated, but did not set forth its evidence as to each of the other issues to the court's satisfaction. The court then ordered that Industrial should respond with its legal theories as to each issue, with a statement of its supporting evidence, and directed that failure to comply would force abandonment of the issue.[1] In response to this order Industrial submitted a 159-page document entitled "Oral Testimony and Documentary Evidence Supporting Plaintiff's Claim of Violations of the Antitrust Laws." This response did not conform exactly to the court's order, and the court dismissed the suit under Rule 41(b), granted defendants' motion to eliminate all issues, and entered summary judgment in favor of defendants. Thereafter, Martin-Marietta, by stipulation, and apparently as a result of a compromise agreement, was dismissed from the suit and is not a party appellee.

*Dismissal Under Rule 41(b)*

 Rule 41(b) provides a rather drastic remedy by which a trial court

1. The order of the Court stated:
"Separately as to each claim which plaintiff intends to assert, whether described in defendants' motion or stated by plaintiff, plaintiff's Second Supplemental Response shall:
'(a) specify with particularity all of the evidence which plaintiff has to support such claim, including all testimony, exhibits and documentary material;
(b) state the facts in detail which plaintiff contends such evidence would prove; and

(c) state the legal theory, with supporting authorities, which would justify a claim by plaintiff based on such facts and proof.'
Failure to furnish the foregoing information fully and completely with respect to any claim shall constitute an admission by plaintiff that it cannot prove such claim and abandons such claim."
Industrial Bldg. Materials, Inc. v. Interchemical Corp., 278 F.Supp. 938, 947–948 (C.D.Cal.1967).

can penalize a plaintiff for his counsel's failure to comply with an order of the court. Application of the remedy rests within the sound discretion of the court, but since it may severely punish a party not responsible for the alleged dereliction of his counsel, the rule should only be invoked in extreme circumstances. In reviewing the propriety of dismissal under Rule 41(b) we should, we think, look to see whether the court might have first adopted other, less drastic alternatives. Flaksa v. Little River Construction Co., Inc., 389 F.2d 885 (5th Cir. 1968); Gill v. Stolow, 240 F.2d 669 (2d Cir. 1957).

Here, Industrial argues that its trial counsel substantially complied with the court's order by submitting the "Narrative" and the "Statement of Oral Testimony and Documentary Evidence." Industrial's then attorney justified his approach by stating to the court that an issue-by-issue answer would have required substantial and unnecessary duplication of the same material for each of the thirty issues. The trial judge at first agreed with this position, but later reversed himself. Whether the documents submitted amounted to substantial compliance was, in the first instance, a question for the trial judge, who was in a position to assess the extent of compliance, the apparent good or bad faith of counsel, and the nature of the understanding as to that which was to be submitted as a response. Even as it related to those considerations, the court's exercise of its discretion is reviewable, but it would certainly not be so vulnerable to challenge were it not for the question of whether suitable alternatives to dismissal were available.

Unfortunately, in undertaking to ascertain whether the court considered other aids to the enforcement of its orders, we derive little guidance from the District Court opinion. It would appear from the opinion that no other sanctions were considered, but the opinion, reported at 278 F.Supp. 938, was written by attorneys for the defendants.

At a hearing on July 31, 1967, the trial judge orally expressed the view that a dismissal would not likely be sustained on appeal because there was "not really aggravation" in the failures of Industrial's counsel. Therefore, he requested counsel for defendant to prepare a proposed decision that would provide a "final buttressing for the mere failure to abide by the order." Defendants' counsel submitted a lengthy "Memorandum in Aid of Proposed Decision," which, except for a few inconsequential changes, was adopted word for word by the judge as his own opinion.

Rule 41(b) requires that the trial judge, when he dismisses on the merits, make findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P., but under Rule 52(a), judges have sometimes merely adopted the findings and conclusions prepared by victorious counsel. This practice has been condemned because of the possibility that such findings and conclusions, prepared by the non-objective advocate, may not fully and accurately reflect the thoughts entertained by the impartial judge at the time of his initial decision. *See* United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–657 n. 4, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). For the nature and purpose of findings of fact and conclusions of law and the duty of the trial judge in their preparation, see United States v. Forness, 125 F.2d 928, 942–943 (2d Cir.), cert. denied, City of Salamanca v. United States, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942).

Some courts have indicated that it is not impermissible for the District Court to adopt, verbatim, proposed findings and conclusions in a case involving highly technical issues, such as may be involved in patent cases and complex scientific problems. *See* Nyyossonen v. Bendix Corp., 342 F.2d 531 (1st Cir. 1965). But such is not the case with

antitrust, and in a recent Clayton Act case, the Supreme Court wrote:

"Those findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence. United States v. Crescent Amusement Co., 323 U.S. 173, 184–185, 65 S.Ct. 254, 89 L.Ed. 160. Those drawn with the insight of a disinterested mind are, however, more helpful to the appellate court. * * * Moreover, these detailed findings were 'mechanically adopted,' to use the phrase of the late Judge Frank in United States v. Forness, 125 F.2d 928, 942, and do not reveal the discerning line for decision on the basic issue in the case."

United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).[2] In the present case, the conclusions of the District Court are interlaced with an inordinate amount of invective, scorn, and unnecessary criticism.[3]

### The Summary Judgment

In dealing with the propriety of the summary judgment in favor of the defendants, we start from the proposition that summary judgment is available only if there are no genuine issues of material fact to be resolved in plenary proceedings. If, under any reasonable construction of the evidence and any acceptable theory of law, one would be entitled to prevail, a summary judgment against him cannot be sustained. In Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Supreme Court underscored the importance of this principle in the field of antitrust law when it wrote that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Id. at 473, 82 S.Ct. at 491.

Industrial's complaint in the District Court consisted of two counts. The first count alleged violation of sections 1 & 2 of the Sherman Act, in that the defendants had (1) conspired with others to force plaintiff out of business in restraint of trade,[4] and (2) attempted to monopolize part of the trade in interstate commerce.[5] The second count alleged that the defendants had engaged in discriminatory pricing in violation of section 2 of the Clayton Act, as amended by the Robinson-Patman Act.[6] We discuss these three theories separately.

---

2. The Supreme Court's criticism of a trial court's adoption, "mechanically," of findings proposed by the prevailing party is, a fortiori, applicable to an expository legal opinion submitted by the successful litigant and adopted by the trial court in support of its judgment.

3. This may, of course, have reflected the true attitude of appellee's attorneys, who authored the comments. We do not criticize these attorneys, recognizing that they were placed in a position of inherent conflict. They were requested to submit an opinion and findings and conclusions which, if adopted by the court, would reflect impartiality and restrained, objective judicial attitude. On the other hand, their duty, as advocates, was to present all their contentions in the light most favorable to their clients.

4. Section 1 of the Sherman Act, 15 U.S.C. § 1 (1964), begins: "Every contract,

combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nation, is declared to be illegal. * * *"

5. Section 2 of the Sherman Act, 15 U.S.C. § 2 (1964), begins: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor. * * *"

6. Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), begins:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality * * *

**(1) Combination or conspiracy in restraint of trade.**

Industrial alleged that defendants (Martin-Marietta and Interchemical) combined with each other, with Industrial's customers, and with the salesman Kite to drive Industrial out of the business of distributing Presstite products. Interchemical's primary answer to this contention was that Presstite had an absolute right to choose its methods of distribution as it saw fit. It argues that Presstite could terminate Industrial's distributorship for any reason, and that what it could do directly, it could do by competing with Industrial. Industrial responded that Presstite could not choose to become a competitor in distributing and then follow by employing unfair or unlawful means of competition.

The right of a distributor to be free of unfair competition from the manufacturer is not a novel question. Normally a manufacturer may control the method of distribution of his product. *See* United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed.2d 992 (1919). The proposition that a manufacturer may cease doing business with a distributor at any time may be open to question. *See* Fulda, Indvidual Refusals To Deal: When Does Single-Firm Conduct Become Vertical Restraint?, 30 Law & Cont. Prob. 590 (1965). In this case, however, there is an allegation that Presstite, instead of merely refusing to deal with Industrial, sought to drive it out of business by unlawful means. Does such a course of conduct amount to an unreasonable restraint on trade?

Poller v. Columbia Broadcasting Sys., Inc., *supra*, is the most frequently cited authority in this area. Poller owned one of two UHF television stations in Milwaukee. The other UHF station was independent, while the only VHF station was affiliated with NBC. Poller sought and obtained affiliation with the CBS network, but the affiliation agreement was subject to unilateral cancellation by CBS on six months' notice. CBS purchased the other UHF station and canceled its affiliation with Poller in accordance with the agreement. Poller then sold his equipment to CBS at what he alleged was a depressed price. He brought an action against CBS under the first two sections of the Sherman Act, alleging that CBS had conspired with its officers, the owners of the other UHF station, and an individual who had arranged the purchase of the other station. The trial judge, in granting summary judgment, ruled that cancellation of the affiliation agreement was nothing more than exercise of " 'the normal right of a producer to select the outlet for its product.' " 368 U.S. at 468, 82 S.Ct. at 488.

The Supreme Court held in *Poller* that summary judgment for defendants had been improper. Poller had alleged that the intent of the conspirators was to eliminate him from the Milwaukee market. In this regard, the Court noted that a producer does not have an absolute right to choose its distributors, since cancellation of distributorships may be part of a conspiracy in restraint of trade. There appeared to be a possible restraint on trade under the rule of Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), in which it was held that a distributor could not be forced out of business through the concerted efforts of the manufacturer and other distributors. Thus, Poller would be entitled to recover if he could prove that defendants had conspired to eliminate his outlet from the Milwaukee market.

where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. * * * "

Klor's v. Broadway-Hale Stores, *supra*, involved a situation similar to that alleged in this case. The defendants included a manufacturer and several distributors of products distributed by the plaintiff. Under agreements with the distributors, the manufacturer discriminated against Klor's with the result of driving it out of business. The Supreme Court held that this conspiracy unlawfully restrained trade by eliminating a competitor from the market.

In Eastman Kodak v. Southern Photo Material Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), the defendant decided to go into the retail sale of its products, purchased some distributorships, and opened retail outlets of its own. It also purchased competing producers. These actions were found by one District Court to be monopolistic in violation of section 2 of the Sherman Act. Defendant then refused to continue offering dealer discounts to its former distributors. The Supreme Court held that this latter action was unlawful because it was in furtherance of an intent to monopolize.

In our case, Presstite was alleged to have monopoly power over the industrial sealant industry. If this were so, then its direct selling to customers at discounts lower than or equal to Industrial's discount would bring Industrial's section 2 cause of action within the ambit of *Eastman Kodak*. But assuming that the affidavits do not support the contention of monopoly power, they are sufficient to raise the likelihood of a restraint on trade, and this would sustain the cause of action for conspiracy. The restraint on trade is the effect on competition in Presstite products, which are admittedly the dominant line of products. First, the general public is damaged by being deprived of an independent distributor, who may handle competing products, thus giving the customer a ready comparison and a less biased assessment of each product. Second, elimination of the major independent distributor would give Presstite even more power to control prices, including those charged by the few remaining small distributors. Third, elimination of Industrial was apparently so effective as to leave it without the ability to continue business in distribution of other lines of sealants, a result constituting a direct restraint on trade. *See* Poller v. Columbia Broadcasting Sys., Inc., 109 U.S.App.D.C. 170, 284 F.2d 599, 607 (1960) (Washington, J., dissenting).

The appellee cites many cases for the proposition that a manufacturer is free to agree with others to replace a distributor.[7] In each of those cases, however, the manufacturer did not enter into competition with the distributor, and there was no removal of a competitor of the manufacturer from the market. In none of those cases did the agreement have an anticompetitive purpose or effect. *See* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76–78 (9th Cir. 1969). When a distributor is replaced by another, the public is given a substitute with no diminution in the number of distributors offering services, but when the manufacturer enters the field and then removes a distributor, the public is left with only the manufacturer instead of the manufacturer and the independent distributor. Accomplishment of this anticompetitive objective by a manufacturer in a dominant market position by means of conspiracy and unfair tactics

---

7. Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir.), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968); Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1 (9th Cir. 1963); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed. 2d 38 (1957); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md.), aff'd per curiam, 239 F.2d 176 (4th Cir. 1956), cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

must surely be proscribed by the antitrust laws.

Such a proscription does not necessarily foreclose a manufacturer from ever replacing a system of independent distributors with its own system of direct sales and of soliciting customers on its own. Whether this course is available under the law and whether it constitutes a lawful alternative are questions that will depend on the particular case. *Cf.* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra.*

Here, Presstite is alleged to have monopoly power, or at least to hold a dominant position in the market, so that any action tending to strengthen that position would be an unreasonable restraint of trade. *See* United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 343 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). We need not decide what result we would reach if the same actions were taken by a less powerful member of the industry.[8]

■ Interchemical argues that there was no conspiracy involved because the separate agreements with Industrial's customers were not a collective arrangement. However, this argument overlooks several factors. The elements of a conspiracy, agreement and intent, may be, and often must be, shown by circumstantial evidence. *See* American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). There were several persons other than customers involved here, including Industrial's principal salesman and officers of the Presstite Division, as well as of Martin-Marietta.

■ Interchemical's final argument is that there should be a clear delineation between the actions taken by Presstite during the time it was owned by Martin-Marietta and those actions taken after Interchemical acquired the company. Industrial maintains, however, that the two successive parent corporations conspired with each other so that the acts of either could be charged to the other. One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy. *Compare* United States v. Bausch & Lomb Optical Co., 34 F.Supp. 267 (S.D.N.Y.1940) *with* Rayco Mfg. Co. v. Dunn, 234 F.Supp. 593, 598 (N.D.Ill. 1964). At least, Industrial may be able to prove, even if by circumstantial evidence, an unlawful agreement on the part of Interchemical with officers of Presstite, with Kite, or with customers after the time of the acquisition. If such an agreement were proved, then Industrial would be entitled to whatever damages flowed from that agreement.

(2) Monopoly and attempt to monopolize.

8. The notion that a dominant manufacturer may not undertake a program of eliminating distributors finds support in many reported District Court decisions. For example, in dealing with a similar situation in Potter's Photographic Applications Co. v. Ealing Corp., 292 F.Supp. 92, 104 (E.D.N.Y.1968), the court wrote:

"In the absence of any allegations of either (1) a horizontal conspiracy between competitors, (2) *an effort by either defendant to establish market dominance or extend a natural monopoly of its own product,* (3) an effort to drive out the products of competing film producers, or (4) other restrictive trade practices (such as price fixing), the agreement between Ealing and Popular Science to grant Popular Science an ex-clusive distributorship in the New York area and Ealing's decision to refuse to continue dealing with plaintiff do not violate the Sherman Act." (emphasis added)

The court then cited all those cases cited by the defendants in this case for the broad, unrestricted proposition that Presstite could conspire with others to eliminate Industrial *as a distributor.* For similar statements as to the true rule, *see* Arzee Supply Corp. v. Ruberoid Co., 222 F.Supp. 237, 241 (D.Conn. 1963); Alexander v. Texas Co., 149 F.Supp. 37, 42–43 (W.D.La.1957); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899, 905 (D.Md. 1956).

Industrial also alleged that the conduct supporting a cause of action for conspiracy would also support a cause of action for violation of section 2 of the Sherman Act, proscribing monopolization or attempt to monopolize. First, Industrial alleged that Presstite holds monopoly power in the sealant industry. Second, Industrial claimed that the Presstite line of products was so unique that it constituted a separate line of commerce—a relevant market—in and of itself, thus being subject to monopolization. Third, plaintiff asserted that a manufacturer may not enter into competition with a distributor and then use predatory tactics to eliminate that distributor.

In response to the first assertion, defendants answered that Presstite competed with around seventy other manufacturers, that Industrial had not alleged specifically any attempt to monopolize the sealant industry as a whole, and that Industrial had not produced sufficient affidavit showings relating to the structure of the sealant market. As to the sealant market structure, Interchemical claimed that Industrial failed to show the nature and uses of the products, the degree of cross-elasticity with other products, and the areas of commerce in which the products were used. Industrial did raise the issue, explicitly, that Presstite had monopolized or attempted to monopolize the entire industry. The affidavit showings relating to the degree of competition from the other manufacturers and relating to the particular products, their uses, and cross-elasticity is extensive and voluminous. Its summarization is unnecessary, for it, on the whole, raises genuine questions of fact as to the issues in question. In an attempt to monopolize situation, only intent to monopolize is in issue, and no proof as to the relevant market is required. Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (9th Cir. 1964).

Industrial also alleged that the breadth and variety of the Presstite line of products renders it so unique that it constitutes, by itself, the relevant market for this purpose. We have been directed to no case in which one manufacturer's line of products was held to be so unique that it could be deemed a distinct line of commerce. Indeed, in light of the statement in United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), that a manufacturer has a natural monopoly over his own products, especially when the products are sold under trademark, it is difficult to see how Industrial could succeed on this theory. A full development of the facts might possibly present such a unique position, especially if that position were acquired by means that show an intent to monopolize the industry, that the court would be justified in finding that a particular manufacturer's line of products is a relevant market. Since there must be a trial, Industrial will have the opportunity to attempt to make out a case on this issue.

Industrial's third theory—that a manufacturer may be found to have attempted monopolization by driving a competing distributor out of business—is substantially the same claim as that made under section 1 of the Act. See United States v. Klearflax Linen Looms, Inc., 63 F.Supp. 32 (D.Minn.1945). The similarity arises not only from the identity of the conduct alleged, but also from the fact that a restraint of trade often results in monopoly or is caused by an attempt to monopolize. In Eastman Kodak, defendant's refusal to give dealers' discounts after it had entered the retail market could be viewed either as being in furtherance of a monopolistic intent or as being a restraint on trade.

Even if the relevant market is sealant products generally, it may be that Industrial can show an intent to monopolize the entire industry, and thus, Presstite's conduct would be in furtherance of an attempt to monopolize. Such a conclusion would be in line with Eastman Kodak. Moreover, if Presstite were found to dominate the market or

hold monopoly power because of its superior products, then its actions against Industrial may yet be unlawful under the rationale of United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 343 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699 (1954). United Shoe Machinery Corporation was ordered to desist from its leasing practices because they tended to solidify its already dominant market position, despite indications that its practices would not be unlawful for a company not occupying a position of dominance.

As the Supreme Court said in *Poller:*

"CBS contends that the monopolization charges are frivolous. We find the record unclear on these claims. In view of our remand for a trial on the merits, we forego any comment thereon. The complaint does not allege the relevant market involved. In the trial court it was argued that UHF broadcasting in Milwaukee was the market, but on the record here we are unable to determine that issue. It may well be that on a trial appropriate allegations and proof can be adduced showing violations of § 2. We believe it to be good judicial administration to withhold decision on these issues."

368 U.S. at 474, 82 S.Ct. 486 at 491 (citations omitted). Just as the Supreme Court had insufficient information in *Poller* to pass on the question of monopolization, so we too are limited here by the fact that there was no trial at which these issues could be factually developed in detail.

(3) Discriminatory pricing.

Industrial's third cause of action alleged that Presstite had offered prices to customers in such a way as to discriminate against Industrial. Among the customers named by Industrial were some to whom goods were sold at prices higher than those charged Industrial, some to whom the prices were the same as what Industrial paid, and some to whom prices were lower than the prices given to Industrial. The trial court held that no cause of action under section 2 of the Clayton Act, as amended by the Robinson-Patman Act, could be stated with respect to the first two groups, since there was either no discrimination or else the discrimination operated to Industrial's benefit. As to the customers who received lower prices than Industrial, defendants admitted that the goods were of like grade and quality. The District Court held, however, that there had been no showing that the goods were in interstate commerce and no showing that the effect of the discrimination "may be substantially to lessen competition or tend to create a monopoly in any line of commerce."

Since Industrial does not challenge the propriety of summary judgment on this cause of action, we need not now consider the merits of that claim. When the case returns for trial, however, it will be in the same posture as if the District Court had granted a partial summary judgment. Fed.R.Civ.P. 56(d). Hence, under Rule 54(b), Fed.R.Civ.P., the court's "decision is subject to revision at any time before the entry of judgment adjudicating all the claims." *See* United States v. Desert Gold Mining Co., 433 F.2d 713, 715 (9th Cir., 1970); 6 J. Moore, Federal Practice ¶ 56.20[3.–4] (2d ed. 1966).

We have attempted to define the issues concerning which a trial is required for resolution. Industrial's showing in opposition to the motion for summary judgment was sufficient. There are genuine issues of fact which cannot be resolved and related to controlling legal principles without a trial.

Reversed and remanded.