**SANCAP ABRASIVES CORPORATION, Plaintiff–Appellant,**

v.

**SWISS INDUSTRIAL ABRASIVES, et al., Defendants–Appellees.**

No. 00–3010.

United States Court of Appeals, Sixth Circuit.

Aug. 16, 2001.

Before BOGGS and CLAY, Circuit Judges, and ROBERTS,* District Judge.

* The Honorable Victoria A. Roberts, United States District Judge for the Eastern District

CLAY, Circuit Judge.

Plaintiff, Sancap Abrasives Corporation ("Sancap" or "New Sancap"), appeals from the district court order awarding Defendants, Swiss Abrasives Marketing, Inc. ("SAM"), SIA Schweizer Schmirgel und Schleifindustrie AG ("SIA"), and C & S Agency, James Connelly, Connelly Inc., Edward Sikes, Sikes Inc. (collectively, "C & S Defendants" or "C & S"), summary judgment on Plaintiff's claims of conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Plaintiff's claims of tortious interference, promissory estoppel, and implied contract under Ohio law. We **AFFIRM.**

## BACKGROUND

Plaintiff, located in Ohio, manufactured and distributed abrasives products throughout the United States. Defendant SIA is a Swiss manufacturer and worldwide seller of industrial abrasives products. Defendant SAM, an affiliate of SIA located in North Carolina, imports and sells SIA-brand products. The C & S Defendants, located in Virginia, serve as independent sales agents for abrasives products distributors.

The relationship between Plaintiff and SIA began in 1992, when Plaintiff's predecessor, Sancap Abrasives Incorporated ("Old Sancap"), contracted to serve as the exclusive distributor of SIA-brand products in the United States. After becoming SIA's exclusive distributor, Old Sancap hired James Connelly and Ed Sikes as sales agents. Old Sancap also converted SIA raw materials, known as "jumbo rolls," into finished products for sale to its customers.

In September of 1996, SIA notified Old Sancap of its decision to terminate the exclusive distributorship agreement, effective January 31, 1997. Although Old Sancap could still purchase SIA products for resale after that date, Old Sancap would make such purchases through SAM, and share in the distribution of SIA-brand products with other distributors. The purchases would be made on an order-by-order basis.

In early 1997, Robert Stuhlmiller, then-President of Old Sancap, informed Connolly and Sikes that Old Sancap had lost the exclusive distributorship agreement with SIA and would likely lose the SIA product line. At this time, Stuhlmiller asked Connolly and Sikes about their loyalty to Old Sancap. Connolly and Sikes responded that they were loyal to Old Sancap so long as Old Sancap retained the SIA product line or was able to find a suitable replacement for the SIA product line.

In response to the meeting with Stuhlmiller, Connolly and Sikes initiated a meeting with Klaus Hoeche, the president of SAM, in April of 1997. The parties dispute the nature of this meeting. The C & S Defendants contend that they wanted to be informed of the status of the SIA product line, which produced approximately 90% of their business. Plaintiff, in contrast, claims that this meeting commenced Defendants' conspiracy to eliminate Sancap from the abrasives industry.

At the first meeting between C & S and Hoeche, Hoeche told C & S that Old Sancap would likely, or at least possibly, lose the SIA line. Sikes informed Hoeche that the livelihood of C & S depended on the SIA product line. Hoeche could not assure C & S as to Old Sancap's continued access to the SIA product line.

In late 1997, SAM decided to set up its own converting operations in Charlotte, North Carolina, to enable SAM to produce

of Michigan, sitting by designation.

its own finished SIA abrasives products for the United States market. In November of 1997, Klaus Hoeche, the president of SAM, informed Robert Stuhlmiller, then-president of Old Sancap, of SAM's decision to begin its own converting operations.

After the termination of the exclusive distributorship agreement, Old Sancap continued to convert and distribute SIA-brand products on an order-by-order basis. At about this time, a group of investors, led by Edward Spinelli, began making inquiries with regard to the possible purchase of Old Sancap. Spinelli met with Hoeche on March 2, 1998, to discuss the relationship between SAM and Old Sancap, which was of interest to the investors given that sales of SIA products constituted a significant portion of Old Sancap's overall sales. Plaintiff contends that at this meeting, Hoeche assured Spinelli that the business relationship between SIA/SAM and Sancap would continue as before, meaning that Sancap would continue to have access to the SIA product line.[1]

On March 23, 1998, Spinelli's investment group purchased the assets of Old Sancap, forming New Sancap. Shortly after purchasing Old Sancap, Spinelli learned that SIA/SAM intended to establish its own converting facility in North Carolina. In April of 1998, Hoeche informed Spinelli that SIA/SAM had not yet made a final decision on whether to go ahead with the converting facility. In July of 1998, Hoeche informed Spinelli that SIA/SAM was definitely going ahead with the converting facility, and that as of October 1, 1998, SIA/SAM would "assume direct marketing and sales of the SIA line in 'the south', specifically in North Carolina, South Carolina, Virginia, Georgia, Ala-bama, Florida and Tennessee." (J.A. at 687.)

Plaintiff contends that the SAM decision to assume distribution of the SIA product line was in furtherance of Defendants' conspiracy to eliminate Sancap from the abrasives industry. SAM responds that its decision arose from legitimate concerns over Sancap's poor economic condition and performance.

After the July, 1998 meeting with Hoeche, Spinelli called the C & S Defendants to a meeting with Spinelli and other Sancap employees. At the meeting, Sancap offered the C & S Defendants the choice of remaining as sales agents for Sancap or following the SIA product line. The C & S Defendants chose to follow the SIA product line.

Sancap contends that the C & S Defendants decided to terminate their relationship with Sancap as part of Defendants' conspiracy. In response, the C & S Defendants maintain that they simply wanted to continue selling SIA-brand products, which they had successfully sold for over forty years between them.

After leaving Sancap, the C & S Defendants began selling SIA products through another distributor, Sunbelt Abrasives, which SAM had selected to distribute SIA products in the southern region. In October of 1998, SAM began its conversion operations. In August of 1999, Sancap ceased operations after surrendering its assets to secured creditors, and subsequently filed for bankruptcy pursuant to Chapter 7 of the Bankruptcy Code in October of 1999.

Following discovery, Defendants filed motions for summary judgment on all of Plaintiff's claims. On September 28, 1999,

---

1. Where appropriate, Defendants SIA and SAM are referred to collectively as "SIA/SAM" throughout the opinion. The alleged conspiracy at issue is between SIA/SAM, collectively, and C & S Defendants.

the district court granted summary judgment to each of the Defendants on all of Plaintiff's claims. Plaintiff appeals.

## DISCUSSION

This Court reviews a district court's grant of summary judgment *de novo. Brooks v. American Broad. Cos.*, 932 F.2d 495, 500 (6th Cir.1991). If the pleadings, affidavits, and other submissions fail to show any genuine issue of material fact, the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). All evidence must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the moving party need not support its motion with evidence disproving the non-moving party's claim; rather, the moving party "need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### A. Sherman Act Section 1 Claim

■ Section 1 of the Sherman Act states that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign states, is declared to be illegal." 15 U.S.C. § 1. Under the "rule of reason" analysis for determining whether a § 1 Sherman Antitrust violation exists, a plaintiff must show: (1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy

were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy. *International Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir.1989) (citing *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988)).

### 1. Conspiracy

■ A conspiracy may be demonstrated by direct or circumstantial evidence. However, circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct. In such a case, the evidence of conspiracy would not preponderate. *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 483 (6th Cir.1990).

■ For a § 1 antitrust claim to survive summary judgment, circumstantial evidence must tend to exclude the possibility of independent conduct. Important factors to evaluate in this analysis include: (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire. *Wallace v.. Bank of Bartlett*, 55 F.3d 1166, 1168 (6th Cir.1995). Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir.1999).

■ First, Plaintiff contends that Defendants' decisions, if made independently, would have been contrary to their economic self-interest. Specifically, if C & S had independently terminated its relationship

with Sancap, its sales income from SIA products would have been lost, and if SIA/SAM had independently terminated its relationship with Sancap, it would have lost the sales agents for most its SIA products sold in the southern United States.[2]

No party disputes that it would have been contrary to the economic self-interest of C & S to terminate unilaterally its relationship with Sancap. The C & S position in this case is straightforward: C & S is primarily in the business of selling SIA products; thus, C & S seeks to maintain business relationships with manufacturers and distributors of SIA products. C & S contends that once SIA/SAM made the independent business decision to terminate its distribution relationship with Sancap, the subsequent C & S business decision was simple: C & S would follow the SIA product line, and thus follow SIA/SAM, rather than lose the SIA line by remaining with Sancap. Therefore, as to C & S, the relevant conspiracy question concerns whether the SIA/SAM decision was actually independent of and prior to the C & S decision, not whether an independent decision by C & S would have been contrary to the economic interest of C & S, which is not disputed.

In contrast, the parties do dispute whether the SIA/SAM decision to terminate unilaterally its relationship with Sancap would have been contrary to SIA/SAM's economic self-interest. Plaintiff contends that because Sancap had been the exclusive distributor of SIA products to the furniture industry in the "Southern Region," and because, according to Plaintiff, 80–90% of Sancap's sales of SIA products in the Southern Region were in fact C & S sales, it would have been contrary to the economic self-interest of SIA/SAM to terminate its relationship with Sancap without retaining C & S.[3]

SIA/SAM responds that it had several legitimate business reasons for terminating its relationship with Sancap, with or without C & S: Old Sancap's poor financial condition and converting quality, lackluster sales, and failure to pay timely invoices. In addition, at the time SIA terminated its relationship with Sancap, SAM was selling SIA abrasives products to approximately 150 distributors in the United States. Plaintiff replies that even after termination of the exclusive distributorship arrangement, Sancap nevertheless remained the only distributor of SIA products in the Southern Region. However, Plaintiff's purported record support for this claim does not in fact address the issue.[4] Further, although Plaintiff identifies record support for the economic de-

---

**2.** Plaintiff actually argues that independently terminating Sancap would have been contrary to SIA/SAM's economic interest because SIA/SAM would have lost its major converter and distributor in the United States. However, C & S Defendants are sales agents, not converters or distributors. Thus, such an argument is irrelevant for assessing the economic wisdom of independently terminating Sancap without the complementary decision by C & S Defendants to offer their sales services to SIA/SAM.

**3.** Plaintiff contends that the "Southern Region," which includes North Carolina, South Carolina, Alabama, Georgia, Florida, Tennessee, Virginia and West Virginia, is the rele-

vant geographic market for Section 1 analysis in this case. Because our review of an award of summary judgment for Defendants views evidence in a light most favorable to Plaintiff, we assume without deciding that the Southern Region is indeed the relevant geographic market in this case.

**4.** Plaintiff cites testimony by Stuhlmiller in support of its claim that Sancap was the only distributor of SIA products in the Southern Region. However, the testimony cited by Plaintiff only discussed limitations on Sancap's ability to sell its own manufactured products.

pendence of the C & S Defendants on SIA products, Plaintiff does not identify similar support for the economic dependence of SIA/SAM on C & S.[5] Given the legitimate business reasons offered by SIA/SAM in support of its decision to terminate its relationship with Sancap, and Plaintiff's failure to identify record support for the position that SIA/SAM was economically dependent on C & S for its sales of SIA products in the Southern Region, we find unavailing Plaintiff's claim that an independent decision by SIA/SAM to terminate its relationship with Sancap, without the sales support of C & S, would have been contrary to the economic self-interest of SIA/SAM.

As to the second conspiracy factor, uniformity of actions, Plaintiff contends that both SIA/SAM and C & S maintained the status quo in their respective relationships with Plaintiff, despite several meetings among Connelly, Sikes and Hoeche discussing, according to Plaintiff, the mutual dependence of SIA/SAM and C & S and their common interest in making greater profits from the SIA product line.

With regard to the third factor, Plaintiff contends that Defendants exchanged information relating to the alleged conspiracy during several meetings and telephone calls between Hoeche and the C & S occurring from April of 1997 until May of 1998, which were not disclosed to Sancap.

To support the fourth factor, Plaintiff contends that Defendants had a common motive to conspire, namely to increase profits from the SIA/SAM product line. Plaintiff specifically references higher commissions received by the C & S Defendants from selling SIA/SAM products with Sunbelt after severing its relationship with Sancap.

■ Defendants offer one broad response to the above points. Because SIA/SAM independently decided, before the meetings with C & S, to terminate the distributorship relationship with Sancap and to set up its own converting operations, this prior, unilateral decision by SIA/SAM precludes finding a conspiracy under § 1. *Nurse Midwifery Assocs. v. Hibbett,* 918 F.2d 605, 611 (6th Cir.1990) ("section 1 does not reach unilateral conduct even if such conduct unreasonably restrains trade"). Defendants also contend that the Hoeche/C & S meetings were a natural response by C & S to the information that SIA/SAM had terminated its exclusive distributorship agreement with Sancap, and resulting concern over the status of the SIA line. Communications, without more, do not constitute a conspiracy, especially where such communications are a natural reaction to an event. *Super Sulky, Inc. v. United States Trotting Assoc.,* 174 F.3d 733, 739 (6th Cir.1999). A showing of frequent meetings between alleged conspirators will not survive summary judgment

**5.** Plaintiff correctly notes that Connelly and Sikes each testified that SIA products generated approximately 80–90% of their annual sales, and that Hoeche testified that SIA products composed over one-third of Sancap's sales. However, when progressing to the C & S share of Sancap's sales of SIA products, Plaintiff's statistics become confused. Plaintiff contends, citing testimony of Sikes and Hoeche, that C & S "sales of SIA products represented 80–90% of the total sales of SIA products by Sancap in the [Southern] Region." Plaintiff's Reply Brief at 8. In fact, as noted above, Sikes testified that 85–90% of *his* sales were of SIA products, not that C & S accounted for 85–90% of Sancap's sales of SIA products. Simply, Plaintiff identifies no record support for its claim that most Sancap sales of SIA products in the Southern Region were in fact C & S sales. Thus, Plaintiff identifies no record support for its larger claim that any attempt by SIA/SAM to sell SIA products in the Southern Region, without C & S, would be contrary to its economic self-interest.

without additional evidence that would permit an inference that the meetings led to an illegal agreement. *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980).

Plaintiff contends that even if the decision by SIA/SAM to set up its own converting line was made in late 1997, the decision to terminate Sancap as a distributor of SIA products was made after the meetings between C & S and Hoeche, which adds to the circumstantial evidence supporting a conspiracy.

Under *Riverview*, we find that the circumstantial evidence in this case is no more consistent with a conspiracy then with independent conduct by SIA/SAM. SIA/SAM provided legitimate reasons for its dissatisfaction with Sancap as a converter and distributor. Plaintiff does not identify record support for the claim that SIA/SAM was economically dependent on C & S, which would have encouraged SIA/SAM to defer a decision on Sancap until after the C & S/Hoeche meetings. Connolly and Sikes are simply in the business of selling SIA products, which they have done for over forty years between them. Accordingly, it is difficult to infer anything more than basic business sense from their decision to follow the SIA line.

In addition, SIA/SAM had been distancing the SIA line from Sancap long before the final decision to terminate Sancap as its distributor. SIA notified Old Sancap in September of 1996 of its decision to terminate the exclusive distributorship agreement. In November of 1997, Hoeche informed Old Sancap of SAM's planned converting operations in North Carolina. We do not find Plaintiff's attempt to sharply distinguish SIA/SAM's converting decision from SIA/SAM's distribution decision availing; Sancap was plainly aware that its future access to the SIA line was in jeopardy well before the

final Hoeche/C & S meeting. SIA/SAM's decisions to terminate the exclusive distributorship agreement in September of 1996, and inform Old Sancap of its North Carolina converting operation in November of 1997, do not suggest a scheming operator that waited to line up its co-conspirators before taking decisive action. We find the circumstantial evidence in this case does not tend to exclude independent conduct by SIA/SAM.

## 2. Remaining Elements of Sherman Act Section 1 Claim

The district court, finding no genuine issue of material fact as to Plaintiff's conspiracy claim, did not address the remaining elements of a Sherman Act § 1 claim. However, even assuming Plaintiff's showing of the first element of conspiracy could survive summary judgment. Plaintiff must also show a genuine issue of material fact as to the remaining § 1 elements: (2) that the conspiracy produced adverse anti-competitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to the conspiracy was illegal; and (5) that the plaintiff was injured as a proximate result of the conspiracy. *International Logistics*, 884 F.2d at 907.

Plaintiff argues that these remaining § 1 elements are satisfied under *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir.1970). *Interchemical* concerned a plaintiff distributor alleging that a defendant manufacturer sought to drive plaintiff out of business by unlawful means in violation of § 1. *Interchemical* found that Plaintiff's evidence was sufficient to sustain a § 1 cause of action:

> [Plaintiff's] affidavits ... are sufficient to raise the likelihood of a restraint on trade, and this would sustain the cause of action for conspiracy. The restraint

on trade is the effect on competition in [the manufacturer's] products, which are admittedly the dominant line of products. First, the general public is damaged by being deprived of an independent distributor, who may handle competing products, thus giving the customer a ready comparison and a less biased assessment of each product. Second, elimination of the major independent distributor would give [manufacturer] even more power to control prices, including those charged by the few remaining small distributors. Third, elimination of [distributor] was apparently so effective as to leave it without the ability to continue business in distribution of other lines of [related products], a result constituting a direct restraint on trade.

*Interchemical,* 437 F.2d at 1342.

*Interchemical* distinguished the mere replacement of a distributor from anticompetitive removal of independent distribution:

When a distributor is replaced by another, the public is given a substitute with no diminution in the number of distributors offering services, but when the manufacturer enters the field and then removes a distributor, the public is left with only the manufacturer instead of the manufacturer and the independent distributor. Accomplishment of this anticompetitive objective by a manufacturer in a dominant market position by means of conspiracy and unfair tactics must surely be proscribed by the antitrust laws.

*Id.* at 1342–43.

Defendants note that the Ninth Circuit, when applying *Interchemical,* has required a showing of "predatory tactics" as well as "dominant position in some relevant market and an actual restraint within that market." *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 803 (9th Cir.1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

This Court, in *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802 (6th Cir.1988), summarized the "rule of reason" analysis under the Sherman Act for cases alleging vertical restraints of trade. First, *Crane* noted the importance of distinguishing "horizontal" from "vertical" restraints for § 1 analysis.

"[H]orizontal" restraints [are] agreements between competitors at the same level of market structure, [while] "vertical" restraints [are] combinations of persons at different levels of the market structure, such as manufacturers and distributors. Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," ... and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products ... They are, therefore, to be examined under the *rule of reason* standard.

*Crane,* 854 F.2d at 805–806 (quoting *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.1978) (emphasis in original)).

Second, *Crane* noted that "a manufacturer's substitution of one distributor for another has been classified by this Circuit as a vertical restraint of trade case, and, pursuant to Supreme Court command, has tested such a case under the rule of reason." *Id.* at 806.

 *Crane* then reiterated the "consistent" holding that for a plaintiff to sur-

vive the pleading stage of a § 1 action alleging violation of the rule of reason, plaintiff must allege anticompetitive effects at the interbrand level. Interbrand competition is competition among manufacturers of the same generic product, and is "the primary concern of antitrust law." *Id.* (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). In contrast, intrabrand competition is the competition between the distributors of the product of a particular manufacturer. A complaint which does no more than state commercial disappointment at losing a distribution contract with a manufacturer fails to allege a restraint of trade. *Crane,* 854 F.2d at 805–06 (citing *Dunn & Mavis, Inc. v. Nu–Car Driveaway,* 691 F.2d 241, 243–44 (6th Cir.1982)).

Plaintiff contends that the *Interchemical* requirements of predatory tactics and dominant market position, as well as the rule of reason standard under *Crane,* are satisfied by the following evidence: predatory conduct was demonstrated by the C & S/Hoeche conspiratorial meetings, as well as Hoeche's failure to fully inform Spinelli of SIA/SAM's converting plans; such predatory conduct ultimately forced Sancap into bankruptcy, which resulted in anticompetitive effects, in that SIA/SAM's dominant market power in the Southern Region increased and C & S gained higher sales commissions.

 Plaintiff's claims of anticompetitive effects at the interbrand level in the Southern Region invariably refer back to itself, in that Plaintiff purports to demonstrate anticompetitive effects simply by reference to consumer loss of Sancap's independent conversion and distribution services in the Southern Region. However, under the rule of reason analysis, "a plaintiff must establish antitrust injury, that is, that the conduct at issue actually caused

injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged." *Metro Industries, Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.1996) (internal quotations and citation omitted).

 Plaintiff's passing references to higher sales commissions and prices for SIA products, and to SIA/SAM's dominant market power, do not create a genuine issue of material fact as to anticompetitive effects at the interbrand level. A manufacturer requires market power to inflict anticompetitive effects on interbrand competition. *See Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 319 (8th Cir. 1986). The manufacturer in *Interchemical* was "alleged to have monopoly power, or at least to hold a dominant position in the market." *Interchemical,* 437 F.2d at 1343. Specifically, the products manufacturer in *Interchemical* had:

> far more shapes, sizes, and styles of sealants than any other manufacturer, and the combined products of thirty to forty of its competitors would be required substantially to duplicate its product line. This broad product line, argues [plaintiff], places [manufacturer] in a somewhat unique sealing position in the industry, inasmuch as customers ordinarily prefer to deal with one supplier who is able to fulfill all their needs rather than several different suppliers.

*Id.* at 1337. Plaintiff offers no such market analysis in this case. Even in the conspicuously narrow "relevant" product and geographic market defined by Plaintiff, namely high-quality coated abrasives for furniture manufacturers in the Southern Region, Plaintiff has offered no evidence of SIA/SAM's dominant position in that market.

We find that Plaintiff's contentions fall squarely within the "jilted distributor" line of cases identified by this Court in *Crane,*

where allegations that a "plaintiff as distributor, and for the sake of argument, any other similarly situated distributors, were injured when terminated by [manufacturer] from distributing [manufacturer's products]," were insufficient to state a claim under § 1. *Crane*, 854 F.2d at 810. Accordingly, even assuming Plaintiff could survive summary judgment as to its conspiracy claim, Plaintiff nevertheless has not raised a genuine issue of material fact as to anticompetitive effects resulting from such conspiracy.

### B. Ohio State Law Claims

#### 1. Tortious Interference

■■■■ Plaintiff argues that the district court erred when awarding Defendants summary judgment on its tortious interference with business relationship claim under Ohio law. Plaintiff claims that SIA/SAM improperly interfered with Sancap's business relationship with C & S. Under Ohio law, the essential elements for a tortious interference claim are:

(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. The basic principle of a 'tortious interference' action is that one, who without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby. However ... acts performed within a business relationship are considered subject to a qualified privilege. In order to overcome a defense of qualified privilege, a party must show that the wrongdoer acted with actual malice [which] denotes an unjustified or improper interference with the business relationship.

*Chandler and Assocs., Inc. v. America's Healthcare Alliance, Inc.*, 125 Ohio App.3d 572, 709 N.E.2d 190, 197 (1997) (internal quotations and citations omitted):

■■■ The factors for determining "improper interference" are as follows: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the proximity or remoteness of the actor's conduct to the interference; (6) the social interests in protecting the freedom of contract and the interference with such; and (7) the relations between the parties. *Hoyt, Inc. v. Gordon & Assocs., Inc.*, 104 Ohio App.3d 598, 662 N.E.2d 1088, 1092 (1995).

Plaintiff argues the following as to these factors for "improper conduct": (1) while conducting secret meetings with C & S, Hoeche led Spinelli to believe that Sancap could continue converting and selling the SIA line in the Southern Region; (2) Hoeche's motive was to eliminate Sancap, a competitor of SIA/SAM; (3) Sancap's interest was to remain in business; (4) SIA/SAM's interests were self-serving; and (5) Hoeche's actions occurred before and during the termination of SIA/SAM's relationship with Sancap.

Defendants respond that Plaintiff's evidence establishes no more than the independent decision by SIA/SAM to establish converting operations and assume distribution of the SIA line, which compelled two at-will employees of Sancap, Connelly and Sikes, to follow the product line that generated almost all of their business.

■■■ The Ohio Supreme Court, in *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853, 861 (Ohio 1999), held that where a contract is terminable at will, a showing of fair competition under Section 768 of the Restatement (Second) of Torts would defeat a claim of tortious interference with contract. However, a de-

fendant who resorted to "improper means" in competing may not assert fair competition under Section 768. *Siegel,* 707 N.E.2d at 861. Accordingly, even in an at-will context, Hoeche's conduct remains relevant for Plaintiff's tortious interference claim.

The record offers the following evidence as to the misleading nature of Hoeche's conduct. On March 16, 1998, Hoeche faxed a letter to Stuhlmiller, with directions for a copy to Spinelli. The letter, in relevant part, stated:

1) [On] March 2, 1998, you confronted me for the first time that you have sold SANCAP, and at the same time, you asked me to meet the new owners.

2) As you did not make Mr. Spinelli aware of your relationship with SAM/SIA, I had to do it. I also told all of you during our discussion that I had to discuss the new situation with Switzerland. A reversal of the Board of Director's decision to establish a converting plant in Charlotte has to be approved by that same body.

3) To date, no official written notification of change in ownership has been received by us indicating when or if this change will take place and the terms of the sale.

4) New ownership bring [sic] with it different credit risks. No request has been received from Mr. Spinelli to establish a line of credit with us. For us to be able to make a determination, complete financial details would be necessary from Mr. Spinelli.

5) Mr. Spinelli also indicated that he needs six (6) weeks to prepare his marketing plan prior to discussing it with me.

All of the above could have been avoided had you or Mr. Spinelli contacted me earlier and not after the event.

As you are all aware, no contract or agreement either written or verbal exists between SIA/SAM and SAN-CAP.... To make product available to SANCAP's new owners after the changeover and until a final discussion can take place, I would suggest the following [financial information and subsequent meetings and agreements].

(J.A. at 575–76). Spinelli did not receive this letter until early April of 1998, when Stuhlmiller provided him with a copy of it.

Hoeche testified that at a meeting with Spinelli in April of 1998, Hoeche told Spinelli that no final decision had been made to reverse the purchase of the converting equipment. In July of 1998, Hoeche told Spinelli that SIA/SAM had finalized their decision to install the converting facilities in North Carolina, and that as of October 1, 1998, SIA/SAM would assume distribution of the SIA line.

Spinelli testified that on March 2, 1998, approximately three weeks before the closing of the Sancap purchase, Hoeche told Spinelli that "for a change finally [there was] someone at Sancap he feels, one, he could trust, and two, someone he could work with and grow in the business to a mutual benefit." (J.A. at 421.) These constituted the "assurances" given by Hoeche and relied on by Spinelli that the relationship between SIA/SAM and Sancap would continue as before, meaning that Sancap could rely on the continued availability of the SIA product line. Spinelli also testified that he first learned that the ongoing relationship between SIA/SAM and Sancap was uncertain only after the meeting with Hoeche in early April of 1998, when Stuhlmiller gave Spinelli a copy of the March 16, 1998 letter.

█ We find, from the above evidence, that the district court did not err when failing to find a genuine issue of material fact as to Hoeche's "improper conduct."

Not only had Hoeche notified Sancap in November of 1997 of SIA/SAM's intention to begin its own converting operations, Hoeche specifically informed Spinelli in April of 1998 that the decision to begin converting operations had not been reversed. Spinelli was also aware before the purchase of Old Sancap in March of 1998 that SIA had terminated the exclusive distributorship agreement with Sancap, and that Sancap's purchases of SIA products had been on an order-by-order basis since early 1997. Further, Hoeche's alleged assurances that he could work with and trust Spinelli did not constitute assurances that the relationship between SIA/SAM and Sancap would continue as before. No reasonable juror could infer "improper" conduct by Hoeche when such conduct, as alleged by Plaintiff, consisted of nothing more than enthusiasm over a future relationship with Sancap, tempered by consistent reminders that the ultimate decision on the details of such a relationship was, at the time, beyond Hoeche's knowledge and control.

### 2. Promissory Estoppel

Plaintiff next argues that the district court erred when granting Defendants summary judgment on its promissory estoppel claim. Plaintiff contends that it presented sufficient evidence of Sancap's reasonable reliance on representations and statements made by Hoeche, and its injury resulting from that reliance, to survive summary judgment.

■ Under Ohio law, the elements of a promissory estoppel claim are a promise, clear and unambiguous in its terms, reasonable and foreseeable reliance, and resulting injury. *Cohen & Co. v. Messina*, 24 Ohio App.3d 22, 492 N.E.2d 867, 872 (1985). Plaintiff argues that a reasonable juror could find that Hoeche made Spinelli such a promise at their March 2, 1998 meeting, again referencing the "assurances" made by Hoeche.

■ We find that no reasonable juror could conclude that Hoeche's statements on March 2, 1998, as represented by Spinelli, constituted a clear and unambiguous promise. Expressing enthusiasm for working together in the future is not a promise to work together in the future, let alone a promise to maintain the availability of a product line. Further, Hoeche's failure to inform Spinelli, prior to Spinell's purchase of Sancap, of SIA/SAM's intention to proceed with its own converting operation, does not raise a genuine issue of fact as to Plaintiff's promissory estoppel claim, because the record nevertheless lacks an unambiguous promise by Hoeche on which Sancap may have reasonably relied. The district court did not err in awarding Defendants summary judgment on Plaintiff's promissory estoppel claim.

### 3. Breach of Implied Contract

■ Plaintiff argues that the district court erred in awarding Defendants summary judgment on Plaintiff's breach of implied contract claim. Under Ohio law, to determine the existence of an implied contract, 'the parties' meeting of the minds is shown by the surrounding circumstances, including the conduct and declarations of the parties, that make it inferable that the contract exists as a matter of tacit understanding." *Stepp v. Freeman*, 119 Ohio App.3d 68, 694 N.E.2d 510, 514 (1997) (citation omitted).

Plaintiff contends that the following evidence establishes that a reasonable juror could find an implied contract between SIA/SAM and Sancap in March of 1998:(1) Spinelli's testimony that he believed the relationship between SAM and Sancap would continue as before; and (2) the continuation of that relationship until July of 1998, when SIA/SAM informed Sancap of

its intention to sever the relationship effective October 1, 1998.

 "To establish a contract implied in fact a plaintiff must demonstrate that the circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended." *Id.* (citation omitted). Although Plaintiff's implied contract claim contains the added wrinkle of purported reliance on the continuing order-by-order relationship between SIA/SAM and Sancap from March until early July of 1998, any reasonable certainty of an agreement ultimately traces back to the same "assurances" by Hoeche on March 2, 1998. Moreover, Hoeche's actions between March and July of 1998 only undermine any tacit understanding that may have existed between the parties. During that time, Spinelli received the March 16, 1998 letter, which stated that "[a]s you are all aware, no contract or agreement either written or verbal exists between SIA/SAM and SANCAP." (J.A. at 577.) In April of 1998, Hoeche declined to assure Spinelli on the future relationship between SIA/SAM and Sancap because the SIA board of directors would not be making a decision on whether to go ahead with converting operations in North Carolina until late June of 1998.

We find, based on the meetings and correspondence between Hoeche and Spinelli from March through June of 1998, that it was not reasonably certain that any tacit agreement existed between SIA/SAM and Sancap as to any continuing relationship. Not only do Hoeche's "assurances" on March 2, 1998, fail to give rise to an agreement, but Hoeche's statements, both in the March 16, 1998 letter and in the meeting with Spinelli in April of 1998, only further distanced SIA/SAM from any tacit agreement that could possibly have existed. The district court did not err in finding no genuine issue of material fact as to Plaintiff's implied contract claim.

## CONCLUSION

We AFFIRM the district court order awarding Defendants summary judgment on Plaintiff's claim of conspiracy under § 1 of the Sherman Act, and claims of tortious interference, promissory estoppel, and implied contract under Ohio law.