**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NICHOLAS B. DELIA,
        *Plaintiff-Appellant,*

        v.

CITY OF RIALTO, a Public Entity;
CITY OF RIALTO FIRE DEPARTMENT,
a Public Agency; STEPHEN C.
WELLS, Individually and as the
Fire Chief for the City of Rialto;
MIKE PEEL, Individually and as
Battalion Chief for the City of
Rialto; FRANK BEKKER,
Individually and as Battalion Chief
for the City of Rialto; STEVE A.
FILARSKY, Individually and as an
Internal Affairs Investigator for
the City of Rialto,
        *Defendants-Appellees.*

No. 09-55514

D.C. No.
2:08-cv-03359-
R-PLA

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
June 11, 2010—Pasadena, California

Filed September 9, 2010
Amended November 8, 2010

18341

Before: Alfred T. Goodwin, Johnnie B. Rawlinson, Circuit Judges, and Mark W. Bennett, District Judge.*

Opinion by Judge Bennett

*The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa, sitting by designation.

## COUNSEL

Michael A. McGill and Carolina V. Diaz of Lackie, Dammeier & McGill, Upland, California, for appellant Nicholas B. Delia.

Howard B. Golds and Cynthia M. Germano of Best Best & Kreiger, L.L.P., Riverside, California, for appellees City of Rialto, City of Rialto Fire Department, Stephen C. Wells, Mike Peel and Frank Bekker.

Jon H. Tisdale and Jennifer Calderon of Gilbert, Kelly, Crowley & Jennett, Los Angeles, California, for appellee Steve A. Filarsky.

## ORDER

The opinion filed September 9, 2010, is amended as follows:

Slip Opinion page 13785, first full paragraph, lines 7-8 — replace "knew they could not directly do without clearly violating the Fourth Amendment" with "declined to do directly."

With that amendment, Judge Rawlinson voted, and Judges Goodwin and Bennett recommended, to deny the Petition for Rehearing En Banc.

The full court has been advised of the Petition for Rehearing En Banc, and no judge of the court has requested a vote.

Appellee Steve A. Filarsky's Petition for Rehearing En Banc filed on October 8, 2010, is DENIED.

Future petitions for rehearing and rehearing en banc will not be entertained.

---

## OPINION

BENNETT, District Judge:

Appellant Nicholas B. Delia ("Delia"), a firefighter, brought this 42 U.S.C. § 1983 action against the City of Rialto, the Rialto Fire Department, Rialto Fire Chief Stephen C. Wells, two Rialto Fire Department Battalion Chiefs, Mike Peel and Frank Bekker, and a private attorney, Steve Filarsky. Delia alleges violations of his constitutional rights arising during a departmental internal affairs investigation. While being represented by counsel and interrogated at headquarters, he was ordered to go directly to his home while being followed by Battalion Chiefs Peel and Bekker in a City vehicle. He was

ordered that when he arrived at his home he was to enter his home while in full view of the Battalion Chiefs, retrieve several rolls of recently purchased insulation, and bring them out of the house and place them in his front yard for inspection by the Battalion Chiefs. Delia was told earlier in the interview that if he failed to do this he could be found to be "insubordinate" and subject to disciplinary action including termination. This order was given a few minutes after Delia and his counsel refused to consent to a warrantless search of his home by Battalion Chief Peel.[1]

The district court granted summary judgment in favor of all defendants. In a written order, the district court held that all of the individual defendants were entitled to qualified immunity. The district court also found that the City of Rialto ("the City") could not be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). This was because Delia failed to show that a municipal policy caused his injury. This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

For the reasons discussed below, we conclude that Delia's constitutional right under the Fourth Amendment of the United States Constitution to be protected from a warrantless unreasonable compelled search of his home was violated. However, because we also conclude that this right, under these or similar facts, was not clearly established at the time of this constitutional violation, we affirm the district court's order granting qualified immunity to Stephen Wells ("Chief Wells"), Mike Peel ("Peel"), and Frank Bekker ("Bekker"). We also affirm the district court's grant of summary judgment

---

[1]Delia asserts in his complaint that defendants' actions violated his right to be free from unreasonable search and seizures under the Fourth and Fourteenth Amendments. He also asserts that defendants violated his right to be free from invasions of privacy under the First, Fifth and Fourteenth Amendments. In this appeal, however, he claims only violations of his Fourth and Fourteenth Amendment rights.

to the City on Delia's *Monell* claim, but reverse the district court's grant of qualified immunity to Steve Filarsky ("Filarsky") and remand for further proceedings.

## I. BACKGROUND

### A. Work Incident And Its Aftermath

In July 2000, Delia was hired by the City's Fire Department as a firefighter. He was later promoted to the rank of engineer. As a result of a disciplinary decision against him, he was demoted back to firefighter in June 2006. On August 10, 2006, Delia began to feel ill while working to control a toxic spill. He was then transported to a hospital emergency room for evaluation. There, a doctor gave him an off-duty work order for three work shifts. The doctor, however, did not place any activity restrictions on Delia.

On August 15, 2006, Delia returned to the hospital. The doctor again issued him an off-duty work order. This time it was for eight shifts. The doctor also scheduled a medical test for him. Again, the doctor did not place any activity restrictions on Delia. On August 22, 2006, Delia returned to the hospital and the doctor gave him an off-duty work order for eight shifts. Once again, no activity restrictions were placed on Delia. Shortly after this examination, Delia underwent a colonoscopy and endoscopy. He was diagnosed with esophagitis, an ulceration of the esophagus. On August 29, 2006, Delia's doctor issued an off-duty work order for the period of August 29, 2006, through September 3, 2006. The doctor cleared him to return to work after September 3, 2006.

The City was suspicious of Delia's off-work status due to his disciplinary history. The record reveals that Delia was previously disciplined for sending improper e-mails. Why this would make the City suspicious of Delia's off-work activities is not readily apparent. In any event, the City hired a private investigation firm to conduct surveillance on Delia. During

this surveillance, Delia was filmed buying building supplies, including several rolls of fiberglass building insulation, at a home improvement store. Based on these observations, the City began a formal internal affairs investigation of Delia to determine whether he was off-work on false pretenses. The City began its internal affairs investigation of Delia despite the fact that Delia had no activity restrictions placed on him by his treating physician and the City possessed no contrary evidence.

As part of the internal affairs investigation, Delia was ordered to appear, on September 18, 2006, for an administrative investigation interview. The interview was conducted by Filarsky, a private attorney retained by the City. Filarsky had previously represented the City in conducting interviews during internal affairs investigations.

## B.   The Internal Affairs Interview

Filarsky's interview of Delia was conducted on September 18, 2006. In addition to Filarsky and Delia, Delia's attorney, Stuart Adams, Peel and Bekker were also present at the interview. At the onset of the interview, Filarsky warned Delia that he was obligated to fully cooperate. Delia was further cautioned that "[i]f at any time it is deemed you are not cooperating then you can be held to be insubordinate and subject to disciplinary action, up to and including termination."

After some preliminary questions, Filarsky asked Delia about any home construction projects he was currently undertaking in his home. Delia answered that he had some duct work done in his home and had purchased some rolls of insulation. He told Filarsky that the rolls were currently sitting in his house. Filarsky showed Delia a videotape of him purchasing home construction materials, including the rolls of insulation, at a store. Filarsky asked Delia whether this insulation had been installed. Delia told Filarsky that it was still bagged at his house. Shortly after this line of questioning, Filarsky

requested Delia and Adams step out of the interview room so he could confer with "the Chiefs." During this break, Filarsky consulted with Chief Wells concerning his desire to order Delia to produce the rolls of insulation for inspection. Chief Wells, who was never present during the interview with Delia, agreed to permit Filarsky to order Delia to produce the rolls of insulation.

Following the break, Filarsky asked Delia to allow Peel to follow him to his house and, once there, permit Peel to enter his home to conduct a warrantless search of the insulation there. On the advice of counsel, Delia refused Filarsky's request. Unable to get Delia to consent to a warrantless search of his house by Peel, Filarsky then asked if Delia would volunteer to have Peel follow him to his house, where Delia would bring out the rolls of insulation to show Peel that they had not been installed. Again, on the advice of his counsel, Delia refused Filarsky's request.

Unable to get Delia to volunteer, Filarsky orally ordered Delia to produce the rolls of insulation from his house. Adams, Delia's attorney, questioned Filarsky's legal authority for issuing such an order and requested that the order be in writing. Following a lengthy break, Delia was presented with a written order to produce the insulation for inspection signed by Chief Wells. The interview then concluded.

## C.   The Search And Resulting Lawsuit

Immediately after the interview, Peel and Bekker followed Delia, in a city vehicle, to Delia's house. Once there, Peel and Bekker parked alongside the curb in front of Delia's house, and waited a few minutes for Adams to arrive. Peel and Bekker never left their vehicle. After Adams arrived, he, Delia, and a union representative went into Delia's house and brought out three or four rolls of insulation and placed them on his lawn. After Delia brought out the last roll of insulation, Peel thanked him for showing them the insulation and the two

drove off. On May 21, 2008, Delia filed this lawsuit. Defendants subsequently moved for summary judgment. At the hearing on defendants' motions for summary judgment, the district court orally granted defendants' motions. The court found that Delia had not established municipal liability against the City. The court concluded that Delia had failed to show that he was injured by an express policy, a longstanding custom, or an official with final policymaking authority. The district court also found that the individual defendants, Chief Wells, Peel, and Bekker were entitled to qualified immunity. However, with respect to Filarsky, the court stated:

> As to Defendant Filarsky, the evidence establishes that Filarsky's conduct did not result in the deprivation of any constitutional right required — as a required element for a 1983 claim. Filarsky's conduct consisted of conducting the interview, arguing with Delia's attorney, and consulting with Fire Chief Wells, who then issued the written order. Filarsky was not present at Delia's house, and at no point was Delia threatened with subordination [sic] or termination if he refused to comply with the order.

The district court's written order granting defendants' motions for summary judgment does not contain this holding.

The district court directed defense counsel to prepare findings of fact and conclusions of law. It appears from the record that the district court mechanically adopted the findings of fact and conclusions of law as prepared by defense counsel.[2]

---

[2]This court has previously noted its disapproval of this practice. *Federal Trade Comm'n v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1215 (9th Cir. 2004); *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1444 (9th Cir. 1985); *Lumbermen's Underwriting Alliance v. Can-Car, Inc.*, 645 F.2d 17, 18-19 (9th Cir. 1980); *Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1339 (9th Cir. 1970). As this court recognized forty years ago in *Interchemical Corp.*: "This practice has been condemned because

In its written order, the district court concluded that Filarsky, as well as Peel, Bekker and Chief Wells, was entitled to qualified immunity. No explanation for this change in the district court's reasoning appears in its written order.[3] The district

---

of the possibility that such findings and conclusions, prepared by the non-objective advocate, may not fully and accurately reflect the thoughts entertained by the impartial judge at the time of his initial decision." *Interchemical Corp.*, 437 F.2d at 1339; *see also United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 657 n.4 (1964) (quoting Judge J. Skelly Wright's admonition, in his Seminars for Newly Appointed United States District Judges 166 (1963), that: " 'lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can. When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.' "); *Nissho-Iwai Co. v. Star Bulk Shipping Co.*, 503 F.2d 596, 598 (9th Cir. 1974) ("We are aware that busy judges sometimes request attorneys to prepare the first draft of proposed findings and conclusions. The vice is when the district judge fails to study them and make such changes as are necessary to be sure they reflect his opinion.").

[3]The dangers of mechanically adopting counsel prepared summary judgment orders appear to be exemplified in this case. The district court's oral reasons for granting summary judgment do not match its written order. Yet, no explanation for this change appears in the record. Because the district court's written order postdates its oral statement, we will proceed on the presumption that the district court abandoned its prior oral reasoning for granting summary judgment. We will, instead, rely exclusively on the district court's written order. *See White v. Washington Public Power Supply Sys.*, 692 F.2d 1286, 1289 n.1 (9th Cir. 1982) (noting that "the rule in this circuit is that the formal findings of fact and conclusions of law supersede the oral decision."); *see also O'Neill v. AGWI Lines*, 74 F.3d 93, 95 (5th Cir. 1996) (noting that "to the extent that the district court's statements from the bench conflict with its formal findings and conclusions of law, we need not consider them."); *Snow Machines, Inc. v. Hedco, Inc.*, 838 F.2d 718, 727 (3d Cir. 1988) (noting that "a formal order controls over a prior oral statement."); *E.E.O.C. v. Exxon Shipping Co.*, 745 F.2d 967, 974 (5th Cir. 1984) (observing that "to the extent the [trial] court's statements from the bench conflict with its formal findings and conclusions, we do not consider them."); *Harbor Tug & Barge v. Belcher Towing,* 733 F.2d 823, 827 n.3 (11th Cir. 1984) ("The trial judge was not bound by his off-hand remarks. In its search for error, the reviewing court looks to the formal findings and conclusions . . .").

court also held that the City was entitled to summary judgment on Delia's *Monell* claim. The district court, again, found that Delia had not established that he was injured by an express policy, a longstanding custom, or an official with final policymaking authority.

## II.  STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 689 (9th Cir. 2010). We must determine whether, viewing the evidence in the light most favorable to Delia, as the nonmoving party, "there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *California Alliance of Child and Family Servs. v. Allenby*, 589 F.3d 1017, 1020 (9th Cir. 2009).

## III.  DISCUSSION

### A.  Qualified Immunity—The City's Employees

[1] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In *Pearson*, the United States Supreme Court offered this explanation of the reasoning behind the concept of qualified immunity: "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* In fact, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " *Pearson*, 129 S.

Ct. at 815 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting).

In considering a claim for qualified immunity, the court engages in a two-part inquiry: whether the facts shown "make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 129 S. Ct. at 815-16. In *Pearson*, the Court overruled its prior holding, in *Saucier v. Katz*, 533 U.S. 194 (2001), that courts had to proceed through the two-step inquiry sequentially. *Pearson*, 129 S. Ct. at 818; *see James v. Rowland*, 606 F.3d 646, 651 (9th Cir. 2010) (recognizing that *Pearson* overruled *Saucier* in part). As the Court explained, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818. Thus, following *Pearson*, it is within our discretion to decide which step to address first. *Brooks v. Seattle*, 599 F.3d 1018, 1022 n.7 (9th Cir. 2010); *Bull v. City & County of San Francisco*, 595 F.3d 964, 971 (9th Cir. 2010) (en banc). Thus, the threshhold question we will decide is whether Delia being ordered to bring the rolls of insulation out of his home for inspection "make[s] out a violation of a constitutional right." *Pearson*, 129 S. Ct. at 816; *see Saucier*, 533 U.S. at 201.

### 1.   Fourth Amendment violation

Delia contends that Chief Wells, Peel, and Bekker violated his Fourth Amendment right to be free from unreasonable searches and seizures when he was ordered to retrieve the rolls of home insulation and show them to fire department personnel. We agree. The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), guarantees, "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Supreme Court has held that the Fourth Amendment applies to "[s]earches and seizures by government employers or supervisors of the private property of their employees." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987).

**[2]** In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court explained that no zone of privacy is more clearly defined than one's home: "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590; *see Kyllo v. United States*, 533 U.S. 27, 28 (2001) (observing that "search of a home's interior" is "the prototypical . . . area of protected activity . . ."); *Silverman v. United States,* 365 U.S. 505, 511 (1961) (observing that "[a]t the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *see also United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (recognizing the core of the Fourth Amendment is protection against unreasonable searches of one's home); *United States v. Brock*, 667 F.2d 1311, 1326 (9th Cir. 1982) (noting that "[o]ne of the foundations of the fourth amendment is the right of the people 'to be secure in their . . . houses.' ")*; cf. New York v. Harris,* 495 U.S. 14, 17 (1990) ("[T]he rule in *Payton* was designed to protect the physical integrity of the home[.]"). Therefore, the warrantless search of a home is presumptively unreasonable unless the government can prove consent or that the search falls within one of the carefully defined sets of exceptions. *See Arizona v. Hicks,* 480 U.S. 321, 327 (1987); *Coolidge v. New Hampshire,* 403 U.S. 443, 474-75 (1971). The circumstances which excuse the failure to obtain a warrant are " 'few in number

and carefully delineated,' " where one's home is concerned.[4]

---

[4]We note that the Supreme Court recently reemphasized that the " 'special needs' " of the workplace" constitute an exception to the general rule that warrantless searches " 'are per se unreasonable under the Fourth Amendment'. . ." *Ontario v. Quon*, 130 S. Ct. 2619, 2630 (2010) (citation and internal quotations omitted). In *Quon*, the Court reviewed a disagreement in *O'Connor v. Ortega*, 480 U.S. 709 (1987), on the proper analytical framework for Fourth Amendment claims against government employers. *Quon*, 130 S. Ct. at 2628. Under one approach, representing the plurality opinion in *O'Connor*, the Court explained the plurality analysis has two steps:

> First, because "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable," *id.,* at 718, a court must consider "[t]he operational realities of the workplace" in order to determine whether an employee's Fourth Amendment rights are implicated, *id.,* at 717 . . . Next, where an employee has a legitimate privacy expectation, an employer's intrusion on that expectation "for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances."

*Id.* (quoting *O'Connor*, 480 U.S. at 717, 718, and 725-726). The competing approach, championed by Justice Scalia in his concurrence in *O'Connor*, "dispensed with an inquiry into 'operational realities' and would conclude 'that the offices of government employees . . . are covered by Fourth Amendment protections as a general matter.' " *Id.* (quoting *O'Connor*, 480 U.S. at 731). Thus, under Justice Scalia's approach, the core inquiry is whether the search would be "regarded as reasonable and normal in the private-employer context." *O'Connor*, 480 U.S. at 732. If so, the search does not violate the Fourth Amendment. *Id.* The Court did not resolve this schism in *Quon*. *Quon*, 130 S. Ct. at 2628. The *Quon-O'Connor* workplace warrant exception, however, has no application here. Although the search at issue in this case arose as a result of a workplace investigation, defendants were not seeking to search Delia's workplace environment, but his home. *See Quon*, 130 S. Ct. at 2633 (concerning search of messages made by police officer on government owned alphanumeric pager); *O'Connor*, 480 U.S. at 712-13 (concerning search of physician's state office and seizure of personal items from his desk and filing cabinet). Moreover, even if the *Quon-O'Connor* workplace warrant exception was applicable to the search here, the search was unreasonable under either the *O'Connor* plurality or Justice Scalia's approach. Under the

*See Welsh v. Wisconsin,* 466 U.S. 740, 749 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 318 (1972)).

In this case, defendants initially attempted to conduct a warrantless search of Delia's house for the insulation by asking for Delia's consent. Presumably, this is because a search conducted with the home owner's voluntary consent is an exception to the Fourth Amendment's proscription on warrantless searches. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *United States v. Rubio,* 727 F.2d 786, 796 (9th Cir. 1983). Filarsky asked Delia to consent to allowing Peel to search for the insulation. Delia, however, refused to consent. Unable to obtain Delia's consent to a warrantless search of his house by Peel, Filarsky tried a different tactic. He sought to obtain Delia's consent to Delia bringing the rolls of insulation out of his home to show Peel that they had not yet been installed. No doubt this was done because an individual does not have an expectation of privacy in items exposed to the public, thereby eliminating the need for a search warrant. *See Katz v. United States,* 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *see also United States v. Broadhurst,* 805 F.2d 849, 856 (9th

---

*O'Connor* plurality approach, the search here was unjustified from the start because there were no reasonable grounds for believing that a search for the insulation was necessary for the investigation. Delia was being investigated for abuse of sick leave. However, no activity restrictions were ever placed on Delia by his treating physician as a result of his work-place exposure to the hazardous substances. Consequently, whether or not he installed insulation in his home was irrelevant to the investigation, since he could install insulation in his home and still be in full compliance with his physician's orders. For these same reasons, we also conclude that the search would fail to satisfy Justice Scalia's approach because it would not be "regarded as reasonable and normal in the private-employer context." *O'Connor,* 480 U.S. at 732.

Cir. 1986) ("What a person knowingly exposes to public view is not protected by the Fourth Amendment"). Delia, however, again rejected Filarsky's request.

**[3]** Unable to obtain Delia's consent to search his home, and alternatively, failing to persuade Delia to voluntarily retrieve the insulation from his home and place it in public view on his front lawn, Filarsky was stymied. It was only at this juncture that Filarsky's final move was to hatch a plan to compel Delia to do indirectly what Filarsky and the City of Rialto officials declined to do directly. Delia was *ordered* to go into his house and bring out the rolls of insulation for inspection. He was cautioned at the beginning of his interview that his failure to cooperate with the investigation could result in charges of insubordination and possible termination of his employment. As a result, Chief Wells's order "convey[ed] a message that compliance with [his] request[ ] [was] required." *Florida v. Bostick,* 501 U.S. 429, 435 (1991). As this court has recognized in the situation where police demand entrance to a dwelling, "compliance with a [governmental] demand is not consent." *United States v. Winsor,* 846 F.2d 1569, 1573 n.3 (9th Cir. 1988) (en banc) (internal quotations omitted). In *Winsor,* police officers decided to enter a hotel and go from room to room looking for a robbery suspect. *Id.* at 1571. "When the police knocked on the door [of the defendants' room] and demanded that it be opened," one of the defendants obeyed, at which point, the police officers recognized the suspect as the robber and found evidence of the robbery in plain view. *Id.* This court found that the defendant had opened the door in response to a claim of lawful authority, not voluntarily. *Id.* at 1573. Consequently, this court held that "the police did effect a 'search' when they gained visual entry into the room through the door that was opened at their command." *Id.* Similarly, under the facts in this case, Delia was compelled to enter his own home and retrieve the insulation for public view by *order* of Chief Wells. Delia's actions were involuntary and coerced by the direct threat of sanctions including loss of his

firefighter position.[5] Therefore, we hold that the warrantless compelled search of Delia's own home, requiring him to retrieve and display the insulation in public view on his front yard, violated Delia's right under the Fourth Amendment to be free from an unreasonable search of his home by his employer.

### 2. Clearly established right

Having found that Delia's Fourth Amendment rights were violated, we turn to the second prong of the qualified immunity inquiry, whether the right was clearly established at the time of the defendants' misconduct. Accordingly, we must focus on what the defendants' knew, or should have known, concerning Delia's Fourth Amendment constitutional rights as of September 18, 2006, the date of Chief Wells's order. Whether a right is clearly established "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Pearson*, 129 S. Ct. at 822 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)); *see Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010); *Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009). Delia bears the burden of demonstrating that the right allegedly violated was clearly established at the time of the incident. *See Greene*, 588 F.3d at 1031; *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1047 (2010); *Galen v. County of Los Angeles*, 477 F.3d 652, 665 (9th Cir. 2007). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that

---

[5]It is well established that public employers generally cannot condition employment on an employee's waiver of constitutional rights. *See O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 717 (1996); *Pickering v. Board of Educ.,* 391 U.S. 563, 568 (1968); *Vance v. Barrett*, 345 F.3d 1083, 1092 (9th Cir. 2003); *see also McDonell v. Hunter,* 809 F.2d 1302, 1310 (8th Cir. 1987) (holding that the state may not require, as a condition of employment, waiver of the Fourth Amendment right to be free from unreasonable searches).

right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see James*, 606 F.3d at 652.

**[4]** This case does not fit neatly into any previous category of Fourth Amendment law. This is best demonstrated by the fact that no party provided any prior case law analogous to this situation. Moreover, until today, this court had not extended *Winsor* beyond situations where police demand entrance. In attempting to demonstrate that the right allegedly violated was clearly established at the time of Chief Wells's order, Delia cites several cases. These cases include this court's prior decision in *Los Angeles Police Protective League v. Gates*, 907 F.2d 879 (9th Cir. 1990), as well as the Supreme Court's decisions in *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation*, 392 U.S. 280 (1968) and *Gardner v. Broderick*, 392 U.S. 273 (1968). A review of these decisions, however, does not demonstrate that Chief Wells's order violated a clearly established right.

Both Supreme Court decisions concern municipal employees who were questioned about corruption in their agencies. In Gardner, the plaintiff, a police officer, was subpoenaed to appear before a New York County grand jury that was investigating bribery and corruption of police officers in connection with gambling operations. *Gardner*, 392 U.S. at 274. Although he was informed of his privilege against self-incrimination, the police officer was told that he would be fired if he did not sign a waiver of immunity. *Id.* After he refused to sign the waiver, he was fired. *Id.* at 274-75. The Court held that the plaintiff was discharged "not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right. . . . He was dismissed solely for his refusal to waive the immunity to which he is entitled if he is required to testify despite his constitutional privilege." *Id.* at 278.

**[5]** The Court reached an identical conclusion in *Uniformed Sanitation Men*, decided the same day as *Gardner*. In

*Uniformed Sanitation Men*, fifteen sanitation workers were summoned to appear at a hearing conducted by a commissioner of investigations. The commissioner was investigating charges that sanitation department employees were not charging certain fees and were keeping other fees for themselves. *Uniformed Sanitation Men Ass'n, Inc.*, 392 U.S. at 281. Each sanitation employee was told that if he refused to testify "his employment and eligibility for other city employment would terminate." *Uniformed Sanitation Men Ass'n, Inc.* 392 U.S. at 282. Twelve workers refused to answer, invoking their privilege against self-incrimination, and were discharged. *Id.* The remaining three workers answered questions at the hearing. They were subsequently suspended as a result of "information received from the Commissioner of Investigation concerning irregularities arising out of (their) employment in the Department of Sanitation." *Id.* The three workers were later summoned before a grand jury and asked to sign waivers of immunity. *Id.* They refused and were fired solely for refusing to sign waivers of immunity. *Id.* at 282-83. The Supreme Court held all the discharges unconstitutional, noting that, "[the sanitation workers] were not discharged merely for refusal to account for their conduct as employees of the city. They were dismissed for invoking and refusing to waive their constitutional right against self-incrimination." *Id.* at 283. Thus, in both *Gardner* and *Uniformed Sanitation Men*, the Court held that public agencies may not impair an individual's privilege against self-incrimination by compelling incriminating answers, or by requiring a waiver of immunity. *See id.*; *Gardner*, 392 U.S. at 278. Neither case involved the legality of a search under the Fourth Amendment. Accordingly, neither *Gardner* nor *Uniformed Sanitation Men* would have put defendants on notice that Chief Wells's order to Delia, with no attendant threat to his employment, constituted a violation of the Fourth Amendment.

[6] Delia also cites this court's decision in *Gates*. In *Gates*, a police officer was served with an administrative warrant to search his garage. *Gates*, 907 F.2d at 883. When the plaintiff

refused to permit the search, he was fired for insubordination. *Id.* Relying on the Supreme Court's decisions in *Gardner* and *Uniformed Sanitation Men*, this court held that the plaintiff "could not be disciplined when he refused to allow the appellants to violate his constitutional rights. As the Supreme Court has pointed out, it is not proper to discharge an officer from duty in order to punish that officer for exercising rights guaranteed to him under the constitution." *Id.* at 886. Thus, the *Gates* decision did not concern the legality of an actual search, let alone a "search" under circumstances similar to this case. As a result, the *Gates* decision, like the Supreme Court's decisions in *Gardner* and *Uniformed Sanitation Men,* would hardly have put defendants on notice that their conduct here violated the Fourth Amendment. Thus, Delia has not demonstrated that a constitutional right was clearly established as of the date of Chief Wells's order, such that defendants would have known that their actions were unlawful. Accordingly, we affirm the district court's grant of summary judgment in favor of Chief Wells, Peel, and Bekker on the ground of qualified immunity.

**B.    Qualified Immunity—Filarsky**

[7] We next take up the issue of whether Filarsky, too, is entitled to qualified immunity. Unlike the other individual defendants in this case, Filarsky is not an employee of the City. Instead, he is a private attorney, who was retained by the City to participate in internal affairs investigations. Delia contends that Filarsky, as a private attorney, is not entitled to qualified immunity. Filarsky, on the other hand, argues that this is a distinction without a difference. He urges this court to follow the Sixth Circuit Court of Appeals's decision in *Cullinan v. Abramson*, 128 F.3d 301, 310 (6th Cir. 1997), and hold that he is entitled to qualified immunity. In *Cullinan*, the Sixth Circuit held that a law firm that had been hired by the City of Louisville to serve as outside counsel was entitled to qualified immunity against plaintiffs' § 1983 claims. *Id.* The court succinctly concluded: "We see no good reason to hold

the city's in-house counsel eligible for qualified immunity and not the city's outside counsel." *Id*. In arriving at this conclusion, the court of appeals relied exclusively on dictum in *Richardson v. McKnight*, 521 U.S. 399, 407 (1997), that "the common law '*did* provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign.' " *Cullinan*, 128 F.3d at 310.

**[8]** The hitch in Delia's argument is that we are not free to follow the *Cullinan* decision. We are "bound by prior panel opinions 'unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions.' " *In re Findley*, 593 F.3d 1048, 1050 (9th Cir. 2010) (quoting *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1441 (9th Cir. 1994)*; Robbins v. Carey*, 481 F.3d 1143, 1149 n.3 (9th Cir. 2007) ("Ordinarily, panels cannot overrule a circuit precedent; that power is reserved to the circuit court sitting en banc."). In *Gonzalez v. Spencer*, 336 F.3d 832 (9th Cir. 2003), another panel of this court held that a private attorney representing a county was not entitled to qualified immunity. *Id*. at 834-35. In *Gonzalez*, the defendant, a private attorney, was retained to defend Los Angeles County in an underlying civil rights suit brought by the plaintiff. *Id.* at 834. The attorney accessed the plaintiff's juvenile court file without notifying him and without obtaining authorization from the juvenile court. *Id*. The attorney employed information from the file in deposing the plaintiff. *Id*. The plaintiff brought suit against the attorney, her law firm, and the county "for accessing and using his juvenile court file without authorization." *Id*. The plaintiff alleged that this conduct constituted a violation of his Fourth and Fourteenth Amendment rights. *Id*. In rejecting the attorney's claim of qualified immunity, this court reasoned, "[the attorney] is not entitled to qualified immunity. She is a private party, not a government employee, and she has pointed to 'no special reasons significantly favoring an extension of governmental immunity' to private parties in her position." *Id*. at 835 (quoting *Richardson*, 521 U.S. at 412); *see Wyatt v. Cole*, 504 U.S.

158, 168-69 (1992) (holding that private defendants in § 1983 suit for "invoking a state replevin, garnishment, or attachment statute" later declared unconstitutional were not entitled to qualified immunity from suit); *cf. Pollard v. The GEO Group, Inc.*, 607 F.3d 583, 602 (9th Cir. 2010) (observing that "[u]nlike officers employed by public prisons," employees of a private corporation operating a federal prison would not be entitled to qualified immunity in *Bivens* cause of action); *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996) (holding that "the common law did not provide immunity to private attorneys conspiring with a judge to deprive someone of their constitutional rights"). Filarsky does not allege any intervening en banc decision, Supreme Court decision, or intervening legislation which would permit us to overrule the holding in *Gonzalez*. Therefore, we are bound by the *Gonzalez* decision. Accordingly, Filarsky is not entitled to qualified immunity as a private attorney and we reverse the district court's grant of summary judgment in his favor and remand for trial, or further proceedings as determined by the district court.[6]

## C.   *Municipal Liability*

**[9]** Finally, we consider whether the City may be held liable under § 1983 for the individual defendants' actions. The City may be held liable under § 1983 for its employees' actions where one of its customs or policies caused a violation of Delia's constitutional rights. *Monell*, 436 U.S. at 690-91.

---

[6]We are skeptical of the district court's oral holding that Filarsky has no responsibility for the deprivation of Delia's Fourth Amendment rights which occurred in this case. We leave to the district court on remand to determine Filarsky's liability consistent with this opinion. We do note that searches by private parties are subject to the Fourth Amendment if private parties act as agents of the government. *Skinner v. Railway Labor Executives' Assn,* 489 U.S. 602, 614 (1989); *United States v. Young*, 153 F.3d 1079, 1080 (9th Cir. 1998). Under § 1983, private parties acting under color of state law can be held liable for violations of federal constitutional rights. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970); *Franklin v. Fox*, 312 F.3d 423, 444 (9th Cir. 2002).

In *Monell*, the United States Supreme Court held that munici-palities are "persons" subject to damages liability under § 1983 where it has caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. The Court further observed that § 1983 also authorizes suit "for constitutional deprivations visited pursuant to govern-mental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-691. The Court, however, specifically rejected the use of the doctrine of *respondeat superior* to hold a municipality liable for the unconstitutional acts of its employees. The Court instructed that municipalities could be held liable only when an injury was inflicted by a city's "law-makers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *munici-pality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.' " *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (Brennan, J., concurring) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)) (emphasis in *Pembaur*).

Even in the absence of an official policy or a custom, the Supreme Court has held that "an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Praprotnik*, 485 U.S. at 123. Under this paradigm, however, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481.

**[10]** Thus, in order to establish an official policy or custom sufficient for *Monell* liability, a plaintiff must show a consti-tutional right violation resulting from (1) an employee acting pursuant to an expressly adopted official policy; (2) an

employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a "final policymaker." *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)*; see Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002); *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). Delia has not directed us to any policy, officially adopted and promulgated by the City. Nor has he established a practice, so permanent and well-settled so as to constitute a custom, that existed and through which Chief Wells acted in ordering Delia to produce the rolls of insulation. *See Praprotnik*, 485 U.S. at 121. Indeed, Delia does not suggest that defendants were acting pursuant to an express official policy or a longstanding practice or custom.

[11] This leaves only the third means of establishing municipal liability available to Delia, that he was injured by an employee of the City with "final policymaking authority." *Id.* at 123. Delia asserts that the individual defendants, and Chief Wells in particular, were acting as final policymakers when ordering him to produce the rolls of insulation. In response, the City argues that none of the individual defendants had final policymaking authority. "[W]hether a particular official has 'final policymaking authority' is a question of state law." *Praprotnik*, 485 U.S. at 124; *see Pembaur*, 475 U.S. at 483 (noting that "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority"); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("'whether a particular official has 'final policymaking authority' is a question of *state law*.'") (quoting *Praprotnik*, 485 U.S. at 123); *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) ("To determine whether a school district employee is a final policymaker, we look first to state law.").

[12] Review of the City's Code of Ordinances reveals that the Fire Chief has not been delegated final policymaking authority regarding any practices for the City's Fire Department. Instead, the City Council is vested with exclusive final

policymaking authority for the Fire Department. Rialto Ordinance Chapter 2.34 governs the City's Fire Department. Section 2.34.020 provides:

> The fire department is a department within the framework of the city's administrative organization and is governed by state and federal laws pertaining thereto and the ordinances, *policies and procedures established by the city council.*

RIALTO, CAL., ORDINANCES § 2.34.020 (emphasis added). Section 2.34.030, which concerns the establishment of a Fire Chief, provides:

> There is a chief of the fire department who is subject to the general supervision of the city administrator and *with the approval of the city council*, solely responsible for the management and conduct of the department.

RIALTO, CAL., ORDINANCES § 2.34.030 (emphasis added). Finally, § 2.34.040 specifies the duties of the City's Fire Chief, providing in pertinent part as follows:

> The duties of the fire chief include, but are not limited to, the following:
>
> A. To *formulate and recommend policies and procedures* pertaining to the enforcement of rules and regulations for the government and operation of the fire department and pertaining to the prevention and control of fires; to administer such policies and procedures *when approved* and to conduct such activities for the city;
>
>      . . . .
>
> H. To carry out such other affairs and assignments *as he/she is assigned by the city council by res-*

> *olution*, or to carry out other functions as described of the fire chief in other provisions of this code;

> I.  To be responsible for the general supervision and administration of the fire safety division.

RIALTO, CAL., ORDINANCES § 2.34.020 (emphasis added).

**[13]** Thus, under these ordinances, even though Chief Wells had final authority over the fire department's day-to-day supervision and administration, he was not authorized to establish city policy. In *Pembaur*, the Supreme Court distinguished final policymaking authority from final decisionmaking authority, observing that:

> The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur*, 475 U.S. at 481-83 (citations and footnote omitted). To drive home this point, the Court offered the following illustration:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of

County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

*Pembaur*, 475 U.S. at 483 n.12.

The facts here mirror the *Pembaur* illustration. Chief Wells clearly had supervisory and final decisionmaking authority over the City's Fire Department. In that capacity, he signed the order requiring Delia to produce the rolls of insulation. The record, however, is devoid of any evidence that Chief Wells's authority included responsibility for establishing final departmental policy. To the contrary, the City's Code of Ordinances places policymaking authority for the fire department in the exclusive hands of the city council. *See* RIALTO, CAL., ORDINANCES §§ 2.34.020, 2.34.030. Thus, only the city council's decisions would provide a basis for city liability. No such decisions appear in the record. As the Supreme Court cautioned in *Praprotnik*, "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 128.

Delia directs our attention to the fact that Chief Wells did not provide the city administrator with a copy of his order to Delia as evidence that he wielded final policymaking authority. This argument confuses final decisionmaking authority with final policymaking authority. While Chief Wells wielded the former, only the latter is sufficient to hold the City liable under § 1983 for his actions. *See Pembaur*, 475 U.S. at 483

& n.12. Indeed, if we were to accept the evidence in this case as establishing *Monell* liability, "the result would be indistinguishable from respondeat superior liability." *Praprotnik*, 485 U.S. at 126 (cautioning that "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability."); *see Clouthier*, 591 F.3d at 1253 (noting that " '[t]o hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law [creating an] end run around *Monell*.' ") (quoting *Gillette*, 979 F.2d at 1348). Accordingly, we conclude that the evidence here fails to establish that Chief Wells had final policymaking authority.

Our conclusion is buttressed by cases from this court as well as our sister circuits. In *Gillette*, 979 F.2d 1342, this court held a fire chief's actions in firing the plaintiff could not constitute the basis for municipal liability because the fire chief was not a final policymaker. *Id.* at 1350. In arriving at this conclusion, this court observed that the fire chief's discretionary authority to hire and fire employees, standing alone, was "not sufficient to establish a basis for municipal liability." *Id.* This court also noted the fact that the "City Charter and ordinances grant authority to make City employment policy *only* to the City Manager and the City Council." *Id.* (emphasis added). In the absence of any evidence that the fire chief actually made policy, this court found that he was not a final policymaker. *Id.*; *see Collins v. City of San Diego,* 841 F.2d 337, 341-42 (9th Cir. 1988) (holding city was not liable for employment actions of police sergeant, even though police sergeant had "discretion to recommend hiring, firing, and discipline of employees", where he was not the city official responsible for establishing final departmental employment policy). The Eighth Circuit Court of Appeals reached the same conclusion in *Davison v. City of Minneapolis*, 490 F.3d 648, 661 (8th Cir. 2007). In *Davison*, the court held that there was insufficient evidence to subject the city to *Monell* liability

for the actions of its fire chief. *Id.* In reaching this conclusion, the court noted that although the fire chief had final decision-making authority regarding employment promotions, there was no evidence that he was also delegated with authority to make final municipal policy regarding employment practices. *Id.*; *see Bechtel v. City of Belton*, 250 F.3d 1157, 1161 (8th Cir. 2001) (holding that city fire chief whose authority over the operations of the fire department was subject to review by the city administrator "had no authority as the 'highest official responsible for setting policy.' ").

**[14]** Likewise, in *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962 (4th Cir. 1995), the Fourth Circuit Court of Appeals arrived at the identical determination. In that case, a firefighter sued the City of Greensboro under § 1983, alleging retaliation by the fire chief because of the firefighter's union participation. *Id.* at 963-64. The fire chief had failed to promote him despite the fact that he had the highest score on the promotions list. *Id.* Examining relevant state and city laws, the Fourth Circuit found that " 'final policymaking authority' over employer-employee relations in the City of Greensboro rests only with the City Council and the City Manager." *Id.* at 965-66. Accordingly, the court held that even though the fire chief may have had final authority to determine whom to promote, he was not authorized to adopt a "municipal policy embodying anti-union animus." *Id.; see Crowley v. Prince George's County,* 890 F.2d 683, 685-86 (4th Cir. 1989) (holding that although a county police chief was responsible for personnel decisions within the police department, he did not have "final policy-making authority" that would impute liability to the county under 42 U.S.C. § 1981). Similarly, in this case, there is a total absence of any policymaking authority delegated to Chief Wells by the City's Code of Ordinances. Chief Wells's final decisionmaking authority regarding whether to order Delia to produce the rolls of insulation, standing alone, is insufficient to subject the City to liability for his action.

Accordingly, we affirm the district court's grant of summary judgment in the City's favor.

## IV. CONCLUSION

Upon *de novo* review, we hold that Delia's Fourth Amendment rights were violated when Chief Wells, Peel, and Bekker affected a warrantless "search" of Delia's home by ordering Delia to go into his home and bring out the rolls of insulation for inspection. Because Delia's actions were involuntary and occurred as a result of the direct threat of sanctions, we hold that the warrantless compelled search of Delia's home violated his rights under the Fourth Amendment. Nevertheless, we conclude that these defendants are entitled to qualified immunity because Delia has not established that this constitutional right was clearly established at the time of Chief Wells's order to Delia. We therefore affirm the district court's grant of summary judgment on their behalf. We further conclude that Filarsky is not entitled to qualified immunity as a private attorney. Thus, we reverse the district court's grant of summary judgment in his favor and remand for trial or further proceedings consistent with this opinion. Finally, we conclude that neither Chief Wells, nor any of the other individual defendants, had final policymaking authority for the City. Therefore, we affirm the district court's grant of summary judgment in favor of the City.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

Each party is to bear its own costs on appeal.